IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**OCT 09 2018**

JEFFREY P. COLWELL
CLERK

JASON BROOKS,
Plaintiff

v.

COLORADO DEPARTMENT OF CORRECTIONS,

CORRECTIONAL HEALTH PARTNERS,

JOHN DOE, M.D., President and CEO of Correctional Health Partners

SUSAN TIONA, M.D., CDOC Chief Medical Officer

Defendants.

## VERIFIED AMENDED PRISONER COMPLAINT
## JURY TRIAL DEMANDED

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

### A.   PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

    Jason Brooks #150014
    Fremont Correctional Facility
    P.O Box 999
    Canon City, CO 81215
(Name, prisoner identification number, and complete mailing address)

    ·None
(Other names by which you have been known)

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

- \_\_\_ Pretrial detainee
- \_\_\_ Civilly committed detainee
- \_\_\_ Immigration detainee
- _X_ Convicted and sentenced state prisoner
- \_\_\_ Convicted and sentenced federal prisoner
- \_\_\_ Other: (*Please explain*)

### B.   DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1:   Colorado Department of Corrections, 1250 Academy Park Loop
Colorado Springs, CO 80910.

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  _X_ Yes \_\_\_ No (*check one*). Briefly explain:

Defendant 1 is being sued in their \_\_\_ individual and/or _X_ official capacity.

Defendant 2:   Correctional Health Partners, LLC, 1515 Arapahoe, Suite 300 Tower 1
Denver, CO 80202.

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  _X_ Yes \_\_\_ No (*check one*). Briefly explain:
Correctional Health Partners ("CHP") is a company that contracts with the

2

      CDOC to provide a comprehensive, cost-effective medical delivery system to inmates in CDOC custody

      Defendant 2 is being sued in their ___ individual and/or _X_ official capacity.

Defendant 3: JOHN DOE, President and CEO of Correctional Health Partners, 1515 Arapahoe, Suite 300 Tower 1   Denver, CO 80202

      At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  _X_ Yes ___ No (*check one*).  Briefly explain:

      The true names and capacities of Defendant DOE, whether individual, corporate, associate or otherwise, are unknown to Plaintiff at the time of filing this Complaint and Plaintiff, therefore, sue said Defendant by such fictitious name and will ask leave of court to amend this Complaint to show his/her true name or capacity when the same have been ascertained. Plaintiff is informed and believe, and therefore allege, that DOE Defendants is, in some manner, responsible for the events and happening herein set forth and proximately caused injury and/or damages to the Plaintiff as herein alleged. Upon information and belief, Defendant DOE is a medical adjudicator/gatekeeper whom is responsible for approving procedures and consultations with providers outside of the CDOC.

      Defendant 3 is being sued in his ___ individual and/or _X_ official capacity.

Defendant 4: Susan Tiona, Chief Medical Officer of the CDOC, CDOC Headquarters, 1250 Academy Park Loop, Colorado Springs, CO 80910.

      At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  _X_ Yes ___ No (*check one*).  Briefly explain:

      She is employed by the CDOC

      Defendant 4 is being sued in his/her _X_ individual and/or _X_ official capacity.

### C. JURISDICTION

*Indicate the federal legal basis for your claim(s): (check all that apply)*

_X_ 42 U.S.C. § 1983 (state, county, and municipal defendants)

___ *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (federal defendants)

_X_ Other: (*please identify*): The court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

## D. STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

### BACKGROUND OF THE CASE

1. In early October 2016', Plaintiff injured his right knee while lifting weights. The injury resulted in chronic knee pain and severely limited Plaintiff's ability to walk without a severe limp.

2. Plaintiff did not know how severe the injury was, so he stayed off his right knee as much as possible and used non-steroidal anti-inflammatories ("NSAIDS") and ice to decrease the pain and swelling in his knee.

3. After almost two months of no significant improvement of the injury, Plaintiff submitted a medical kite to see the doctor.

4. On December 12th, 2016, Plaintiff was evaluated by Defendant Tiona at the Fremont Correctional Facility ("FCF)". Without physically touching Plaintiff's knee, she noted "[r]ight knee without overt swelling, but maybe a slight amount of edema lateral to the patellar tendon, just inferior to the joint line and medial to the fibular head. Palpation at this area produces tenderness. No crepitance. *No ligament laxity.*" Defendant Tiona ordered X-rays.

5. On December 20, 2016, X-rays were performed and showed "very mild degenerative arthrosis involving the medial fomorotibial compartment. Ovoid, probably bone island is incidentally noted in the distal femoral metaphysis. There is no joint effusion."

6. Upon information and belief, these x-rays showed only very mild degenerative

4

changes in Plaintiff's knee and because the impression showed "no acute bony abnormality," the possibility of arthritis as a causative factor of Plaintiff's pain and discomfort should have been ruled out. Upon information and belief, the "bone island" was an articular cartilage fracture and was egregiously ignored by the radiologist as being "incidentally noted."

7. On January 12th, 2017, Defendant Tiona evaluated Plaintiff for follow-up, noting "a positive lateral McMurray, c/w lateral meniscus pathology. However, he also has some discomfort with medial McMurray (to a lesser degree). Actually has joint line tenderness bilaterally."

8. Upon information and belief, pursuant to community standards of care, the McMurray test in the general standard in examining someone for a meniscus injury. According to Dr. Jeffery Wunder, M.D., a positive McMurray test on its own necessitates an MRI to diagnose a meniscus injury and is the standard of care in the medical community.

9. Defendant Tiona subjectively understands that an MRI was necessary to properly diagnose Plaintiff's injury after a positive McMurray test; however, in order for any inmate in the CDOC to receive an MRI, a policy between CHP and CDOC requires providers to exhaust conservative therapy before even requesting an MRI to be approved by CHP and/or Defendant DOE.

10. This policy requiring CDOC medical providers to exhaust conservative therapy before requesting an MRI has been derived out of a contract between CDOC and CHP (the "Contract"). The Contract describes how both CHP and CDOC approve the criteria by which utilization management determinations are made, with "utilization management" defined as "the function wherein use, consumption of services, and level of intensity of care are reviewed using utilization review techniques."

11.     The Contract includes an indemnity clause, whereby CHP agrees to indemnify CDOC "against any and all claims, damages, liability and court awards including costs incurred as a result of any act or omission by [CHP], or its employees, agent, subcontractors, or assigners pursuant to the terms of this Contract." CHP also indemnifies any claims in connections with the performance with the Contract, "regardless of whether the CDOC knew or should have known of improper services, performance, materials or supplies;" as well as claims or losses attributable to "any person injured or damages by the erroneous or negligent acts, including without limitation, disregard of federal or state regulations or statutes by CHP, it's officers, employees, or subcontractors in the performance of the Contract, regardless of whether the CDOC knew or should have known of such erroneous or negligent acts."

12.     Requiring an inmate to exhaust conservative therapy in order to receive an MRI is at irreconcilable odds with community standard of care treatment and is a policy that is negligent at best and deliberately indifferent on its face.

13.     The Contract also includes a cost savings plan, cost saving plan incentive, and cost saving plan disincentive. The costs are calculated on a per offender per month ("POPM") basis, varying by month based on monthly costs and average daily population ("ADP"). If a contractor is able to lower the cost of the POPM rate paid by the CDOC for all outside specialty, ancillary, hospital, and professional healthcare, the CDOC expects to share savings with CHP, incentivizing both CHP and CDOC to lower cost by providing knowingly negligent medical care. In fact, the entire design of the Contract represents "a cooperative and ongoing effort by both CHP and CDOC to provide a comprehensive, *cost-effective* medical delivery system," which incentivizes medical professionals to consider cost over their Hippocratic Oath and community standards of care.

14.     If conservative therapy is not attempted and a request for an MRI is submitted by a

6

CDOC provider to CHP, CHP and/or Defendant DOE will automatically deny the request without making any actual medical decision, in complete and deliberate disregard of Plaintiff's injury. In fact, Defendant DOE has previously testified that he does not even engage in the practice of medicine in adjudicating MRI referrals for inmates, as his role in approving/denying referrals is simply that of a medical gatekeeper/adjudicator. Defendant DOE has further testified that he has "no ability to suggest alternative care for any CDOC inmate."

15. Due to Defendant Tiona being CDOC's Chief Medical Officer, she was fully aware of—and responsible for implementing aspects of—the Contract, which requires providers to exhaust conservative therapy before requesting an MRI being approved by CHP. Motived by this policy of negligence and cost savings, rather than uphold her Hippocratic Oath and due Plaintiff no harm by immediately requesting an MRI, Defendant Tiona knowingly and wantonly disregarded Plaintiff's injury and began conservative management, which, according to Defendant Tiona, "would be a steroid injection."

16. Defendant Tiona further instructed Plaintiff to "refrain from any LE activity other than walking for 2 weeks, then may advance activity as tolerated" and advised Plaintiff to start a knee conditioning program two weeks after the steroid injection, providing Plaintiff an orthopedic packet explaining the exercises Plaintiff was required to perform to rehabilitate the injury.

17. Without the benefit of an MRI, Defendant Tiona knew Plaintiff faced a substantial risk of harm working out on his unknown knee injury and disregarded that risk by failing to take reasonable measure to abate it. In fact, Defendant Tiona injecting Plaintiff's knee with a steroid increased Plaintiff's risk of substantial harm by masking the pain associated with his serious medical needs and constitutes deliberate indifference.

18. Because of the masking of symptoms from the steroid injection, Plaintiff's knee

seemed to improve significantly, although there was still locking/buckling of his knee at times. Plaintiff played basketball daily and complied thoroughly with the knee conditioning program provided by Defendant Tiona.

19.     On February 27th, 2017, Defendant Tiona again evaluated Plaintiff. Defendant Tiona noted "right knee internal derangement appear to be healed after cortisone injection." Defendant Tiona noted to "continue to monitor" Plaintiff's right knee, "but appears to be a resolved issue."

20.     Responding to a kite Plaintiff had sent stating that his right knee was once again causing him significant problems after the effects of the steroid injection had worn off, Defendant Tiona evaluated Plaintiff again on April 18, 2017. She noted "at this time, his pain is constant and made worse with ambulating. He cannot walk at a fast pace or run at all. Going up and down stairs is also increasingly painful. A couple weeks ago, his leg just buckled when he was trying to jog…gait is unremarkable. However, he does have positive McMurray indicating lateral cartilage damage. Has joint line tenderness. No laxity of MCL, ACL, or LCL. No effusion present at this time. Previous X-rays of right knee shows no DJD." Defendant Tiona, knowing she had exhausted conservative treatment by this time, finally ordered an MRI, which was approved by CHP since conservative therapy was exhausted.

21.     Plaintiff was provided an MRI on June 9th, 2017. Despite Plaintiff staying off his knee as much as possible, the MRI impressions were shocking, noting the following: "Suspect sprain or strain of the ACL. Suspect laxity of the posterior cruciate ligament with evidence of a chronic posterior cruciate ligament with evidence of a chronic posterior cruciate ligament tear. Severe osteochondral loss and degenerative arthritis at the medical femoral condyle." There was also "a small tear posterior body of the lateral meniscus."

8

22. The MRI finding of alleged "degenerative arthritis," however, is at irreconcilable odds with Plaintiff's x-rays that were performed just seven months earlier. Upon information and belief, the x-rays showed no pre-existing arthritis. Accordingly, the only plausible explanation for these severe degenerative changes in Plaintiff's knee from December 2016' to June 2017 was a direct result of Defendant Tiona's deliberate indifference to Plaintiff serious medical needs by injecting Plaintiff's with a steroid and telling him to go work out on and rehabilitate a sprained ACL, a ligament tear in his PCL, a meniscus tear, and an osteochondral defect.

23. Upon information and belief, had the Contract between CDOC and CHP not required Defendant Tiona to exhaust conservative therapy options, she would have requested an MRI immediately. Her decision to delay requesting an MRI was a direct result of the Contract/policy between the CDOC and CHP. Defendant Tiona further knew her deliberate acts involved in knowingly violating her Hippocratic Oath is an acceptable practice for providers to adhere to in the CDOC because CDOC is indemnified by CHP for these deliberate acts and ultimately cannot be held liable for known risk that may cause inmates significant, irreversible, life-changing injuries. .

24. Since an MRI was not performed pursuant to community standards of care, it is impossible to determine whether or not Plaintiff's ligament tear was stable at that time the injury occurred and it is impossible to determine whether or not the osteochondral defect/articular cartilage fracture could have been properly rehabilitated. The facts only tell us that a stable tear definitively turned into a "chronic posterior cruciate ligament tear" and no arthritis being noted on the x-rays suddenly transformed into "severe osteochondral loss and degenerative arthritis at the medical femoral condyle" in seven months. The positive McMurray test, which indicated a meniscus injury, was properly noted by Defendant Tiona in January 12th, 2017, but should have been performed a month earlier.

25.  Plaintiff was eventually provided arthroscopic surgery in November 2017, which rectified the meniscus tear. Micro fracturing was also performed to try and help lessen the impact of the osteochondral defect; however, the specialist who recommended the surgery told Plaintiff that he will probably need a knee replacement in the future and his knee will never be the same again. The chronic PCL tear remains; the ACL injury is undiagnosed and it is unknown if there is actually a tear of Plaintiff's ACL. Plaintiff was given no explanation how his ACL could have remained sprained or strained by the time he was eventually provided an MRI, which occurred three months after Plaintiff had limited bearing any weight on his knee ( from March – June 2017).

26.  Plaintiff cannot exercise or play sports without significant pain in his right knee. His life has changed dramatically and he has lost the enjoyment of all his beloved leisure activities, which will remain for the rest of his natural life according to the medical specialist whom treated his injuries.

## CLAIM ONE
### Violation of the Eighth Amendment Based on Deliberate Indifference to Serious Medical Needs and/or Negligence
### (Defendants CDOC, CHP, DOE, Tiona)

27.  Plaintiff restates and incorporates by reference the allegation contained in all previous paragraphs of his Complaint.

28.  Defendant Tiona knew Plaintiff faced a substantial risk of serious harm of permanent damage to his knee and disregarded that risk by failing to immediately apply to CHP for approval of an MRI to properly diagnose Plaintiff's injury. The Contract between CHP and CDOC that requires exhaustion of conservative treatment was the moving force behind Defendant Tiona's deliberate indifference and negligence to Plaintiff's serious medical needs.

29.  The resulting delay in medical care and requirement that Plaintiff exhaust

conservative therapy caused Plaintiff to work out on and somehow rehabilitate a sprained ACL, a ligament tear in his PCL, a meniscus tear, and an osteochondral defect, directly leading to significant pain and deterioration of Plaintiff's knee well beyond the events that precipitated the initial injury and falls below the standard of care in the medical community. Upon information and belief, Plaintiff's leg should have been stabilized in December 2016' and he should have been advised to stay off his knee entirely until a MRI was performed.

30. The result of Defendant's deliberate indifference and negligence infer that a stable tear in Plaintiff's knee definitively turned into a "chronic posterior cruciate ligament tear" and no arthritis being noted on the x-rays transformed into "severe osteochondral loss and degenerative arthritis at the medical femoral condyle" in seven months due to the delay in proper medical treatment. These delays in proper treatment and diagnosis resulted in irreversible damage to Plaintiff's knee and have become life-altering.

31. Defendant DOE fully understands that his role in the approval of MRI's is one of a medical gatekeeper only, as he adjudicates claims without making any medical decision, in complete disregard to inmates' actual medical needs. Defendant DOE knows this policy can result in the risk of substantial harm to inmates and he has failed to take reasonable measures to abate these risk.

32. Defendant CHP's indemnification clause incentivizes CDOC providers to knowingly disregard their Hippocratic Oath and community standard of care treatment; advises CDOC providers to knowingly provide—at best—negligent medical care; and instructs CDOC providers to "disregard federal or state regulations or statutes" when providing inmates medical treatment by holding them harmless for their intentional acts "regardless of whether the CDOC knew or should have known of improper services, performance, materials or supplies."

33. Defendant CDOC has willfully supported a policy that provides knowingly

11

negligent medical care to inmates and supports a Contract that incentivizes cost savings over community of standard of care medical treatment, allowing indemnification for these negligent acts over federal and state regulations. This wanton deliberate indifference constitutes a policy or custom of the CDOC that supports and incentivizes the cruel and unusual punishment of inmates throughout the CDOC and the negligent medical treatment of inmates at best.

34. Brooks seek injunctive relief against Defendants requiring CDOC and CHP to eliminate the requirement that providers in the CDOC exhaust conservative treatment before requesting an MRI.

35. Brooks seek injunctive relief against Defendants requiring Defendants DOE and CHP to approve all MRI request that are submitted from CDOC medical providers following a positive McMurray test, as such requirement is the standard of care in the medical community.

36. Brooks seek injunctive relief against Defendants prohibiting CDOC medical providers from willfully ignoring federal and/or state regulations.

37. Brooks seek injunctive relief against Defendants forbidding any CDOC medical provider from knowingly violating their Hippocratic Oath and providing negligent medical care.

38. Brooks seek injunctive relief against Defendants from devising a contract that incentivizes cost savings over the health and well-being of inmates in the CDOC.

39. Brooks is entitled to nominal, compensatory, and punitive damages and other appropriate equitable and legal relief for these violations and the pain, suffering, and emotional distress he has experienced as a result of Defendants deliberate indifference and/or negligence to his serious medical needs that caused the irreversible damage to Plaintiff's knee.

**CLAIM TWO**
**Violation of Fourteenth Amendment Based on the State-Created Danger and Special-Relationship Doctrines**
**(Defendants CDOC, CHP, DOE, Tiona)**

40. Plaintiff restates and incorporates by reference the allegation contained in all previous paragraphs of his Amended Complaint.

41. Plaintiff is a member of a limited and specifically definable group; namely, inmates in the CDOC whom require outside specialty, ancillary, hospital, and professional healthcare.

42. These Defendants conduct has placed Plaintiff and other inmates in the CDOC at substantial risk of serious harm to their serious medical needs.

43. Defendants CHP and CDOC have created the danger or increased Plaintiff's vulnerability to the danger in permitting Defendants DOE the unilateral authority to obstruct inmate's access to MRI approvals and other outside specialty, ancillary, hospital, and professional healthcare by arbitrarily denying these medical request without any medical judgment being made.

44. Defendants created the danger or increased Brooks' vulnerability to the danger in causing irreversible damage to his knee.

45. These risks are well known and obvious to Defendants based upon community standards of care required to properly diagnose the severity of knee injuries and the Contract specifically acknowledging that "regardless of whether the CDOC knew or should have known of improper services, performance, materials or supplies;" as well as claims or losses attributable to "any person injured or damages by the erroneous or negligent acts, including without limitation, disregard of federal or state regulations or statutes by CHP, it's officers, employees, or subcontractors in the performance of the Contract, regardless of whether the CDOC knew or should have known of such erroneous or negligent acts."

46. Defendants have acted with reckless and conscious disregard of the risk of preventing inmates from receiving MRI's and other outside specialty, ancillary, hospital, and

13

professional healthcare by incentivizing cost savings over the health and well-being of inmates in the CDOC.

47. Defendants have effectively stripped Plaintiff and all other inmates in the CDOC from receiving adequate medical care, which permits Defendant DOE the unilateral authority to act as a medical gatekeeper to inmates needing MRI's and other outside specialty, ancillary, hospital, and professional healthcare, without making any medical judgment, in complete and total disregard of Plaintiff and all other inmates similarly situated in the CDOC actual medical needs.

48. Plaintiff has been prevented from receiving adequate medical treatment because of the Contract. The continued inaction of these Defendants to provide MRI's without first exhausting conservative treatment and approval of other outside specialty, ancillary, hospital, and professional healthcare, without making any medical judgment, proves a malicious, sadistic, and conscience disregard to all inmates in the CDOC who require treatment of their serious medical needs.

49. Defendants Tiona and DOE act with reckless and conscious disregard of federal or state regulations or statutes that require community standard of care treatment be provided to inmates. Acting as a gatekeeper to all outside specialty, ancillary, hospital, and professional healthcare, Defendant DOE has effectively stripped Plaintiff and other inmates of their right to adequate medical care for their serious medical needs.

50. Such conduct, when viewed in total, is conscience shocking, in that Defendants are willfully aware of known obvious risks that are so great that it is highly probable that serious, irreversible damage to inmates' health will follow. In fact, the Contract specifically acknowledges such risk and advises Defendant CDOC and Tiona to ignore them

51. Defendants Tiona and DOE have acted with conscious and unreasonable disregard

of the consequences in denying medically necessary outside specialty, ancillary, hospital, and professional healthcare to inmates without these gatekeeper determinations being made with any medical judgment.

52. Brooks seeks injunctive relief to prevent a substantial risk of serious harm of Defendant DOE's gatekeeper role being continued without actual medical decisions being made as to the medical necessity of outside specialty, ancillary, hospital, and professional healthcare for inmates. Defendant Tiona and DOE conduct has caused and will continue to cause Plaintiff and the other inmates in the CDOC irreparable injury unless they are permanently enjoined by the Court.

53. Brooks is entitled to nominal, compensatory, and punitive damages. These Defendants conduct indicate a reckless or callous disregard to Brooks' federally and state protected rights.

### CLAIM THREE
### Civil Conspiracy
### (Defendants CDOC, CHP, DOE, Tiona)

54. Plaintiff restates and incorporates by reference the allegation contained in all previous paragraphs of his Amended Complaint.

55. Defendants CDOC and CHP have agreed, by words and conduct, to accomplish an unlawful goal or accomplish a goal through unlawful means. The unlawful goal includes, without limitation, preventing Plaintiff from being provided adequate medical care, as required by federal and state regulations, and incentivizing cost savings over the health and well-being of inmates in the CDOC. The unlawful means includes, without limitation, instructing CDOC providers, including Defendant Tiona, to "disregard federal or state regulations or statutes" when providing inmates medical treatment by holding them harmless for their intentional and negligent

acts by ignoring their Hippocratic Oath and community standards of care required to practice medicine, "regardless of whether the CDOC knew or should have known of improper services, performance, materials or supplies."

56. These Defendants have engaged in overt acts to accomplish their unlawful goal or means—including engaging in creating policies that are deliberately indifferent on their face—as identified and described throughout the Verified Complaint—in order to knowingly, recklessly, and wantonly hinder, impede, and obstruct Brooks, and all other inmates similarly situated, being able to receive acceptable medical care and make it as difficult as possible to litigate federal claims against the CDOC, it principals, agents, and/or employees through indemnification of these overt acts.

57. Brooks has suffered damages and injuries caused by the acts of these Defendants to accomplish their unlawful goal, as identified and described throughout the Verified Complaint, simply to save money and prevent having to provide acceptable medical care to Plaintiff and escape liability from creating an atmosphere where negligence is unacceptably likely, which will continue into perpetuity until the Contract is abolished and/or amended.

58. Brooks is entitled to nominal, compensatory, and punitive damages and other appropriate equitable and legal relief for these egregious acts.

**CLAIM FOUR**
**Violation of First Amendment and Fourteenth Amendment Based on Obstruction of Court Access and Equal Protection**
**(C.R.S. § 13-20-602)**

59. Plaintiff restates and incorporates by reference the allegation contained in all previous paragraphs of his Amended Complaint.

60. Under Colorado Law, § 13-20-602(1)(a), C.R.S. mandates that "[i]n every action

16

for damages or indemnity based upon the alleged professional negligence…of a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review for…the licensed professional named as a party, as specified in subsection (3) of this section, within sixty days after the service of the complaint, counterclaim, or cross claim against such person unless the court determines that a longer period is necessary for good cause shown.

61. Pursuant to § 13-20-602(4), C.R.S., "[t]he failure to file a certificate of review in accordance with this section shall result in the dismissal of the complaint, counterclaim, or cross claim."

62. Defendants fully understand that *pro se*, incarcerated, indigent defendants cannot obtain certificate of reviews to hold CDOC and/or CHP employees accountable for professional negligent conduct or medical malpractice. Defendants provide knowingly negligent medical care to all inmates whom have positive McMurray test because such conduct is nearly impossible for inmates to litigate against and Defendants know they can escape liability for such conduct.

63. Due to Plaintiff's incarceration and indigence, he cannot obtain a certificate of review and therefore cannot seek legal redress for negligence and/or medical malpractice claims against Defendants in this case, constituting a First and Fourteenth Amendment violation for deterring, obstructing, and hindering Plaintiff's ability to litigate against Defendants negligent conduct and tilting the scales of justice against Plaintiff, who only by coincidence of life in prison is poor.

64. Plaintiff seeks declaratory relief announcing § 13-20-602, C.R.S. unconstitutionally deprives *pro se*, incarcerated, indigent inmates the ability to seek legal redress for medical malpractice and/or negligence claims against licensed professionals in the state of Colorado.

65. Plaintiff seeks injunctive relief allowing Plaintiff to obtain a certificate of review

17

from a licensed professional so he can litigate negligence and/or medical malpractice claims against Defendants in this case.

### E.   PREVIOUS LAWSUITS

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? __X__ Yes ___ No (*check one*).

*If your answer is "Yes," complete this section of the form. If you have filed more than one previous lawsuit, use additional paper to provide the requested information for each previous lawsuit. Please indicate that additional paper is attached and label the additional pages regarding previous lawsuits as "E. PREVIOUS LAWSUITS."*

1. Name(s) of defendant(s) in first lawsuit: DAVID OBA, PATRICK BLAKE, ANGIE TURNER, CORRECTIONS CORPORATION OF AMERICA, DEBRA FOSTER, JULIE RUSSELL, KATHY HOWELL, TIM CREANY, DAVID TESSIERE, DOLORES MONTOYA, and TRUDY SICOTTE

2. Docket number and court name: 13-cv-02894-CBS

3. Claims raised in prior lawsuit: ADA, Eighth Amendment Claims

4. Disposition of prior lawsuit (for example, is the prior lawsuit still pending? Was it dismissed?): Ongoing, Tenth Circuit reversed the districts courts holding

5. If the prior lawsuit was dismissed, when was it dismissed and why? N/A

6. Result(s) of any appeal in the prior lawsuit: Won on appeal, resolved a claim with CCA Defendants, still ongoing.

7. Name(s) of defendant(s) in second lawsuit: COLORADO DEPARTMENT OF CORRECTIONS, CYNTHIA COFFMAN,

18

|   |   |
|---|---|
|   | TERESA REYNOLDS, LEEANN PUGA, YVETTE BROWN, RICK RAEMISCH, JOEL STRICKLER, MS. PRIETO, JAY HUDSON, LEWIS T. BABCOCK, GORDAN P. GALLAGHER, DOES 11-50 |
| 8. Docket number and court name: | 17-cv-02190-CMA |
| 9. Claims raised in prior lawsuit: | First, Eighth, and Fourteenth Amendment Claims |
| 10. Disposition of prior lawsuit (for example, is the prior lawsuit still pending? Was it dismissed?): | Ongoing, Apeal pending in Tenth Circuit, Appeal No. 18-1266 |
| 11. If the prior lawsuit was dismissed, when was it dismissed and why? | Alleged failure to state a claim |
| 12. Result(s) of any appeal in the prior lawsuit: | Pending. |

### F. ADMINISTRATIVE REMEDIES

*WARNING: Prisoners must exhaust administrative remedies before filing an action in federal court regarding prison conditions. See 42 U.S.C. § 1997e(a). Your case may be dismissed or judgment entered against you if you have not exhausted administrative remedies.*
Is there a formal grievance procedure at the institution in which you are confined?

  _X_ Yes ___ No (*check one*)

Did you exhaust administrative remedies?

  _X_ Yes ___ No (*check one*)

### G. REQUEST FOR RELIEF

State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "G. REQUEST FOR RELIEF."

19

WHEREFORE, Mr. Brooks respectfully requests that all his injunctive and declaratory relief be granted as requested; to award Plaintiff compensatory and punitive damages to be determined at trial; to summarily grant relief on any other issue that may be deemed just and equitable, including all costs and attorney's fees that may be associated with this action; or any other relief that may be determined just and equitable.

### H. PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
(Plaintiff's signature)

_____10/03/18_____
(Date)